IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **THE ESTATE OF MICHAEL TRISTIAN PAONE, DECEASED,** by and through the Administrators of the Estate, Michael Paone, Jr. and Lisa Paone et al., <br><br> *Plaintiffs,* <br><br> v. <br><br> **PLYMOUTH TOWNSHIP et al.**, <br><br> *Defendants.* | **Case No. 2:22-cv-02178-JDW** |

## MEMORANDUM

Police officers routinely encounter stressful situations, fraught with uncertainty. They receive training to deal with those situations, but no amount of training can perfectly capture every situation that an officer might encounter. Legally, when police officers act unreasonably, they can be held to account. But the determination of reasonableness must take into account the circumstances; it can't be done with hindsight.

Officers Kyle Lowery and Gerald DeSantis of the Plymouth Township Police Department shot and killed Michael Paone, a young man who had a mental illness and was holding a toy gun. The facts are heartbreaking, and it would be easy to condemn the Officers from the comfort of an armchair. That's not the inquiry, though. When I review the evidence from the perspective of a reasonable officer on the scene, the only

conclusion is that the Officers did not violate Mr. Paone's rights when they shot him. I will therefore grant the Defendants' motion for summary judgment.

I.   **BACKGROUND**

The Parties have submitted video of much of the encounter between Mr. Paone and Officers Lowery and DeSantis. Where possible, I have drawn the facts from that video. *See Scott v. Harris*, 550 U.S. 372, 380–81 (2007). Where the video is not conclusive, or where it does not show the events in question, I have resolved factual disputes and drawn reasonable inferences in the Estate's favor.

   **A.   Dispatch Information**

The night of August 3, 2021, Officers Lowery and DeSantis responded to reports of a stabbing at the Plymouth Gardens apartment complex. The initial caller was Juliana Paone, Mr. Paone's sister, who told the 911 dispatcher that Mr. Paone had a knife, had "jumped" her, and that she thought he was trying to stab their mother. (ECF No. 35-33 at 2.) She also informed the 911 dispatcher that Mr. Paone had a history of mental health issues and had "fake toy guns." (*Id.* at 2–3.) When asked, she clarified that Mr. Paone was in possession of the toy guns. (*Id.* at 3.)

At the time, Officer Lowery was working the night shift and Officer DeSantis was working as an overtime officer, available as backup for regular, on-duty officers. The radio report from dispatch advised the Officers of an "armed subject, [at] Plymouth Garden

apartments, unit 200," and that the "caller's brother has a knife and he tried to stab his mother." (ECF No. 35-32 00:04–10.)

When the report came in, Officer DeSantis was using the restroom and had therefore turned off his body-mounted camera. Because he forgot to turn his camera back on, only Officer Lowery's body camera footage of the night's events is available. Officer Lowery's body camera activated at 11:12 p.m.,[1] while he was driving to the apartment complex. Shortly thereafter, dispatch relayed over the radio that the 911 caller "is in another building," "the mother and brother are currently in apartment 200," and that "the subject is going to be a 22-year-old male with mental health issues." (ECF No. 35-7 3:12:33–42.) About a minute later, dispatch radioed that "we're getting another caller stating that she was stabbed by her son." (*Id.* 3:13:42–47.) At some point, the computer screen in Officer Lowery's patrol car reported "brother has fake toy guns on him" and "has mental health issues." (ECF No. 35-24 at 3 of 9.)

Officers Lowery and DeSantis arrived at the apartment complex around 11:15 p.m. Dispatch communicated over the radio that "the patient is going to be waiting outside of apartment 205" and that "they believe the son is still inside the apartment." (ECF No. 35-7 3:15:13–17.) As the Officers arrived in their vehicles, they saw an individual run away from the area where (they soon learned) Mr. Paone was located. That individual told

---

[1] The date and time stamp in the upper-right corner of the video is four hours ahead of captured events, so a time stamp of 3:12 a.m. on August 4, 2021, correlates to 11:12 p.m. on August 3, 2021. (ECF No. 35-4 ¶ 3.)

3

Officers Lowery and DeSantis that Mr. Paone had a gun, and he and another bystander helped the Officers locate Mr. Paone. The Officers began to approach Mr. Paone on foot. As they did so, they saw Lisa Paone, Mr. Paone's mother, "covered in blood." (ECF No. 35-4 ¶ 41.) Officer DeSantis heard her say "I'm dying" before she collapsed in front of his parked vehicle. (*Id.* ¶ 98.)

At this point—*i.e.*, just before the Officers confronted Mr. Paone—both knew that Mr. Paone had stabbed his mother, a bystander had told them that Mr. Paone had a gun, and Officer Lowery was aware that Mr. Paone had mental health issues. Neither Officer Lowery nor Officer DeSantis was aware that the gun in Mr. Paone's possession was reportedly a "fake toy," though that information was available in the event register on their vehicles' computers. (*Id.* ¶ 25.) They both believed that Mr. Paone's gun was real.

B.  **Confrontation And Shooting**

Mr. Paone stood on the lawn outside an apartment building, holding the gun at his side. The area was dimly lit by a floodlight, but it was dark out and hard to see. Officer DeSantis took a position between two parked cars. To his right, Officer Lowery stood near the corner of a wood-paneled fence surrounding a dumpster, pointing his gun and flashlight at Mr. Paone. Both Officers instructed Mr. Paone to drop his gun.[2]

---

[2] At this point in the interaction Mr. Paone said something as well, possibly "kill me." (ECF No. 35-7 3:16:02–03.) And the Estate alleges that he was smoking a cigarette. But neither Officer heard Mr. Paone say anything or saw him smoking, and I can't discern either from the video evidence. But even if Mr. Paone did what his Estate claims, it would not affect my ruling.

Mr. Paone dropped the gun and stood with his arms by his sides. The Officers instructed him to step away from the gun. But Mr. Paone reached down, recovered the gun, and pointed it at Officer DeSantis. Officer DeSantis heard the gun click, which he interpreted as the gun malfunctioning. Officer Lowery opened fire.[3]

Mr. Paone fell to the ground, and the Officers held their fire. He sat up; the Officers repeatedly instructed him to drop the gun. Instead, Mr. Paone raised the gun towards Officer Lowery. The Officers opened fire a second time, then paused. After a moment, Mr. Paone pointed the gun at Officer DeSantis. The Officers opened fire again, then stopped. Officer Lowery took cover behind the fence corner, causing his camera to lose sight of Mr. Paone. After Officer Lowery stepped out from behind the fence, he instructed Mr. Paone to drop the gun. Instead, Mr. Paone stood up and pointed the gun at Officer Lowery. The Officers opened fire a final time. Mr. Paone fell to the ground and did not get up.

Officer Lowery asked, "Where's the gun Gerry, did you see it?" Officer DeSantis responded "No." Officer Lowery then approached Mr. Paone, who was still lying on the ground. Mr. Paone received medical treatment at the scene and was transported to a hospital. He died later that night from his gunshot wounds.

---

[3] It's not clear from Officer Lowery's bodycam footage whether Officer DeSantis fired in the first volley of shots. He claims in his deposition that he did, but the Estate asserts in the Statement Of Undisputed Facts that he did not. (*See* ECF No. 35-4 ¶ 115.) On Officer Lowery's bodycam video, three shots from Officer Lowery are audible, and there don't seem to be any other shots. I will therefore resolve that factual question in the Estate's favor and assume that Officer DeSantis did not fire in the initial volley.

From the time the Officers first approached Mr. Paone to the last shots being fired, approximately 45 seconds elapsed. Several of the bullets that the Officers fired hit the exterior of an apartment building. Later, police recovered Mr. Paone's BB gun from the scene. The difference in appearance between it and a real gun of a similar style is minimal. (*See* ECF No. 35-5 at 8–9.) Because it was a BB gun, Mr. Paone's gun did not have the orange tip that typically denotes a toy weapon. *See* 15 U.S.C. § 5001(b); 15 C.F.R. §§ 272.1-272.3. In fact, it is marked "WARNING: Not a toy. Misuse or careless use may cause serious injury or death." (ECF No. 35-22 at 11 of 18.) The Officers only learned that it was a BB gun after the incident.

### C. Procedural History

The Estate filed its initial Complaint on June 3, 2022. It filed its Second Amended Complaint ("SAC") after Judge Berle Schiller—who previously had this case—ruled on Defendant Plymouth Township's Motion To Dismiss. After another motion to dismiss, Judge Schiller permitted seven claims to proceed: a Fourth Amendment excessive force claim against Officers Lowery and DeSantis (Count I); a municipal liability claim against Plymouth Township (Count II); state-law claims for survival and wrongful death against the Officers (Counts V and VI); a state-law assault and battery claim against the Officers (Count VII); a state-law negligent infliction of emotional distress claim against the Officers (Count VIII); and a state-law intentional infliction of emotional distress claim against the Officers (Count IX). On May 13, 2024, Defendants Plymouth Township, Officer Lowery, and

Officer DeSantis filed a Motion For Summary Judgment. (*See* ECF No. 35.) The Motion is ripe for disposition.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure Rule 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "[T]he plain language of Rule 56[(a)] mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In ruling on a summary judgment motion, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the [summary judgment] motion." *Scott*, 550 U.S. at 378 (quotation omitted). However, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings; instead he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007). Where there is no genuine issue of material fact, "concerns regarding the credibility of witnesses cannot defeat summary judgment." *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998).

### III.   ANALYSIS

#### A.   Federal Claims

Section 1983 "provides a civil remedy for the 'deprivation of any rights, privileges, or immunities secured by the Constitution and laws.'" *Halsey v. Pfeiffer*, 750 F.3d 273, 290 (3d Cir. 2014) (quoting 42 U.S.C. § 1983)). To state a claim under Section 1983, a plaintiff must show that "some person has deprived him of a federal right" and "that the person who has deprived him of that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

#### 1.   Excessive force claim against Officers Lowery and DeSantis

Qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Courts should not "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). Though a court need not identify a case "directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* at 741. As an affirmative defense, the burden of establishing qualified immunity falls on the official claiming it. *See Burns v. Pa. Dep't of Corr.*, 642 F.3d 163, 176 (3d Cir. 2011).

To determine if an officer's conduct is entitled to qualified immunity, courts ask two questions: (1) whether the facts alleged, taken in the light most favorable to the party

8

asserting the injury, show that the defendant's conduct violated a federal right; and (2) whether the right at issue was clearly established when the conduct took place. *See Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014). The first question overlaps with the merits of the liability determination, so I will assess the Estate's excessive force claim by considering the two-prong qualified immunity test.

### a. Constitutional violation

The Fourth Amendment demands that police officers use no more force than is "objectively reasonable in light of the facts and circumstances confronting them" at the time. *Graham v. Connor*, 490 U.S. 386, 397 (1989) (quotations omitted). When assessing reasonableness, courts consider: (i) the severity of the crime at issue; (ii) whether the suspect poses an immediate threat to the safety of the officers or others; and (iii) whether the suspect actively is resisting arrest or attempting to evade arrest by flight. *See Jefferson v. Lias*, 21 F.4th 74, 79 (3d Cir. 2021). Other factors include the physical injury to the plaintiff and whether the suspect is violent, dangerous, or armed. *See id.* Importantly, the reasonableness of a particular use of force must be judged "based upon the information the officers had when the conduct occurred," *Saucier v. Katz*, 533 U.S. 194, 207 (2001), not "with the 20/20 vision of hindsight," *Graham*, 490 U.S. at 396. And it must account for "the totality of the circumstances leading up to the shooting," not just "the precise moment of the shooting." *Johnson v. City of Philadelphia*, 837 F.3d 343, 350 (3d Cir. 2016) (quotations omitted).

Because reasonableness is such a fact-intensive inquiry, it is "normally an issue for the jury." *Jefferson*, 21 F.4th at 79. But in this case, there's no factual dispute that might permit a reasonable juror to conclude that Officers Lowery and DeSantis violated Mr. Paone's rights. When the Officers approached Mr. Paone, he was standing outside of the apartment complex with a gun in his hand. They instructed him to drop it, and he did so momentarily. But then, instead of stepping away from the gun as the Officers directed, Mr. Paone leaned forward, grabbed the gun, and pointed it at Officer DeSantis. At that moment, from the Officers' perspective, Mr. Paone became an immediate, deadly threat to the Officers' safety, and "[p]olice officers do not enter into a suicide pact when they take an oath to uphold the Constitution." *Lamont v. N.J.*, 637 F.3d 177, 183 (3d Cir. 2011). After the first volley of shots, Mr. Paone fell to the ground; the Officers held their fire and did not fire again until Mr. Paone raised the gun again. This cycle of holding their fire, instructing Mr. Paone to drop the gun, and only firing their weapons when Mr. Paone pointed the gun at one of them repeated twice more. Because the Officers used force only in response to Mr. Paone's own threat of force, to protect themselves and others at the scene, no reasonable juror could find their decision to shoot Mr. Paone excessive.

The factors that the Supreme Court identified in *Graham* support this conclusion. The Officers were responding to reports of a violent crime, and when they arrived on scene, there was visual evidence of that violence: Lisa Paone was covered in blood. Further, the Officers had reason to think that Mr. Paone posed an immediate threat. He had

attacked his mother, a bystander told them he had a gun, when they located him they could see that he had a gun, and after dropping the gun he disobeyed their commands, picked it back up, and pointed it at them. Even after they shot him, he kept picking up the gun and pointing it at them. And Mr. Paone resisted arrest by refusing to comply with the Officers' commands. He complied at first by dropping the gun, but then he disobeyed them—in the most dangerous way possible—by retrieving the gun.

The Estate's arguments to the contrary are unpersuasive. *First*, it was reasonable for the Officers to believe and act as if Mr. Paone's gun was real. There's no evidence that either Officer saw the event register information about Mr. Paone having toy guns. But even if I give the Estate the benefit of the doubt and assume that the Officers should have seen the information on their screens reporting that Mr. Paone had toy guns, that was only one piece of the puzzle. A bystander told them that Mr. Paone had a gun, not a toy or BB gun. The gun that they observed did not have any markings to indicate it was a toy, such as an orange plug. In fact, photos of the BB gun next to a real gun of a similar style persuade me that from several feet away, in the dark, Mr. Paone's gun resembled a real gun. (*See* ECF No. 35-5 at 8–9.) And Officer DeSantis heard the gun make an audible click, indicating it could fire but was malfunctioning.

Where police officers have a "reasonable, but mistaken, belief[] ... courts will not hold that they have violated the Constitution." *Saucier*, 533 U.S. at 206. In light of this apparent threat, the Officers were not required to "remain passive in the face of an active

threat on [their lives]" and wait to engage until they knew if Mr. Paone's gun was real and operable. *Elliott v. Leavitt*, 99 F.3d 640, 644 (4th Cir. 1996).

*Second*, the Estate is wrong in its assertion that Mr. Paone's mental health status could render the Officers' actions unreasonable. Whether Mr. Paone had mental health challenges or not, once he pointed a gun at the Officers, they didn't have to attempt de-escalatory measures that might have put their lives at risk. "No citizen can fairly expect to draw a gun on police without risking tragic consequences." *Id.* That's true even for those citizens afflicted with mental illness. *See Johnson*, 837 F.3d at 353.

*Third*, the Estate submits that Officer DeSantis's decision not to fire in the first volley demonstrates that he was aware of the report that Mr. Paone's gun was fake. But this is not a reasonable inference. Even if Officer DeSantis didn't fire the first time, he fired after that, which suggests that he thought the gun was real. In any event, it's a logical leap, not a reasonable inference, to get from "Officer DeSantis didn't fire" to "Officer DeSantis knew the gun was fake." The Estate would have to offer some piece of evidence to bridge that gap before the inference might become reasonable. In the absence of any, it's just a guess, and "speculation and conjecture may not defeat a motion for summary judgment." *Acumed LLC v. Advanced Surgical Servs., Inc.*, 561 F.3d 199, 228 (3d Cir. 2009) (citing *Lexington Ins. Co. v. W. Pa. Hosp.*, 423 F.3d 318, 332–33 (3d Cir. 2005)).

*Fourth*, and finally, the nonbinding cases that the Estate cites to support its argument are not persuasive. They all concern factual circumstances dissimilar from this

one. In *Rush v. City of Philadelphia*, I found the video of the incident "not conclusive." No. 19-cv-0932, 2021 WL 308229, at *4 (E.D. Pa. Jan. 29, 2021). This case is the opposite: the videos of the incident leave no doubt about what happened, and they show that the Officers' use of force was not excessive.

I am similarly unpersuaded by the Estate's reliance on *Ardo v. Pagan* to argue that the need to use lethal force against Mr. Paone arose from the Officers' own, pre-seizure unreasonable behavior. *See* 652 F. Supp. 3d 545 (E.D. Pa. 2023). *Ardo* dealt with an individual suffering from a mental health crisis "confined to [his mother's] property" and armed with "a weapon of short-range lethality," as well as troopers "potentially engaged in reckless behavior" that created their need to shoot. *Id.* at 561, 563 (quotations omitted). Mr. Paone, conversely, was on the lawn of an apartment complex with a gun. In addition, unlike the troopers in *Ardo*, Officers Lowery and DeSantis's response to the situation was not reckless. They approached Mr. Paone and clearly and repeatedly instructed him to drop his gun. And they fired only when Mr. Paone raised it towards them. Therefore, the right discussed in *Ardo*, *i.e.*, the right to be free from "reckless or deliberate" police conduct that "results in the need for lethal force" or unreasonable reliance on lethal force "as a first resort in confronting an irrational suspect who is armed only with a weapon of short-range lethality and who has been confined on his own property," does not apply here. *Id.* at 561 (quotations omitted).

### b. Clearly established

Even if there were a genuine dispute as to the reasonableness of the force that Officers DeSantis and Lowery used, the Estate can't show that they violated a clearly established right. Determining whether a right was clearly established requires a two-part inquiry. *See Peroza-Benitez v. Smith*, 994 F.3d 157, 165 (3d Cir. 2021). First, a court must define the right allegedly violated "in light of the specific context of the case, not as a broad general proposition." *Id.* (quotation omitted). Second, a court must ask whether the right was "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* (same).

Neither the Estate nor the defense offers a clear definition of the right at stake. However, the Estate focuses its arguments on Mr. Paone's mental health issues and the report of a toy gun (*see* ECF No. 37-2 at 16–18), so I will too. Looking at the facts of this case, I define the right at issue as a right to be free from lethal force without the use of de-escalatory techniques when police officers have reason to know that the individual has mental health issues and that the individual might have a toy gun.

Although the Estate does not offer a definition of the right, it references several rights: (i) "a right to be free from excessive lethal force when [someone is] standing still, unarmed, and asking a police officer for help"; (ii) "a right to be free from excessive lethal force when [someone is] unarmed with their back toward a police officer and moving away from the officer"; (iii) a "right to be free from unreasonable use of lethal force when

not posing a threat to the safety of police officers or others"; (iv) the *Ardo* right to be free from "reckless or deliberate" police conduct that "results in the need for lethal force" or unreasonable reliance on lethal force as a first resort; and (v) the right of an individual with mental health issues "to be free from excessive lethal force after not following all of a police officer's commands because police officers are expected to follow official policies that instruct officers that individuals with mental health issues may not be able to fully comprehend commands." (*Id.* at 16–17.)

None of these captures the circumstances of this case. The Officers used lethal force only in response to the direct threat that Mr. Paone posed, *i.e.*, him pointing the gun at one of them. They did not discharge their weapons when Mr. Paone was standing still and unarmed, nor when his back was to them, nor when he posed no threat to their safety. And the Officers did not create a need for or unreasonably rely on lethal force, as in *Ardo*. Finally, the force that the Officers deployed was not excessive. They were entitled to use deadly force—even against an individual with mental health issues—when that individual pointed a gun at them.

Having defined the right, I must determine whether the law clearly established it. To determine if this right was "clearly established" by August 2021, I look at factually analogous Supreme Court precedent, binding opinions from the Third Circuit, and for a "robust consensus of cases of persuasive authority in the Courts of Appeals." *Peroza-Benitez*, 994 F.3d at 165 (citation omitted). At the time of Mr. Paone's shooting, the law

15

did not establish such a right. To the contrary, it was well-established that "[w]hen an individual points his gun in the officers' direction, the Constitution undoubtedly entitles the officer to respond with deadly force." *George v. Morris*, 736 F.3d 829, 838 (9th Cir. 2013) (quotation omitted); *see, e.g.*, *Lamont*, 637 F.3d at 183. Mr. Paone's mental health issues did not entitle him to less than the full panoply of constitutional protection. *Cf. Johnson*, 837 F.3d at 352–53. But neither was he entitled to more protection; the threat he posed, armed with a gun, was no less serious. To put it differently, the Constitution does not require police officers to "gamble with their lives" and accept otherwise unacceptable risks to their and bystanders' safety solely because the suspect has mental health issues. *Elliott*, 99 F.3d at 641.

### 2. Municipal liability

To demonstrate municipal liability for failure to train, a plaintiff must show that his injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 93, 105 (3d Cir. 2019) (quotation omitted). However, "municipal liability will only lie where municipal action actually caused an injury," so a municipality "cannot be liable on a failure to train theory for conduct that … did not violate the plaintiffs' constitutional rights." *Grazier ex rel. White v. Philadelphia*, 328 F.3d 120, 124 (3d Cir. 2003). Thus, because I conclude that Officers Lowery and DeSantis did not violate Mr. Paone's constitutional rights, there can be no finding of municipal liability against Plymouth Township.

### B. State Law Claims

Pennsylvania's Political Subdivision Tort Claims Act ("PSTCA") grants broad immunity from tort suit to local agencies and their employees, subject to certain exceptions enumerated in 42 Pa. C.S. § 8542 and § 8550. For agency employees, it is a defense "that the conduct of the employee which gave rise to the claim was authorized or required by law, or that he in good faith reasonably believed the conduct was authorized or required by law." *Id.* § 8546(2). This provision protects employees as long as a judge does not determine that the underlying act is a crime, actual fraud, actual malice, or willful misconduct. *Id.* § 8550.

The Estate brings assault and battery, negligent infliction of emotional distress, and intentional infliction of emotional distress claims against Officers Lowery and DeSantis and contends that their conduct falls under the willful misconduct exception to immunity. I disagree. Willful misconduct requires at least a showing that "the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow, so that such desire can be implied." *Renk v. City of Pittsburgh*, 641 A.2d 289, 293 (Pa. 1994) (quotation omitted). In the police conduct context, the standard is even higher, requiring not just intent to act, but intent to act in the prohibited manner. *See id.* at 293–94. The Estate therefore needs to show that the Officers subjectively intended to do something that they knew was wrongful for the willful misconduct exception to apply. *See id.* But the facts do not support such a showing for the assault and battery or IIED claims.

Rather, the facts show that the Officers acted reasonably in the face of an apparent deadly threat. And the NIED claim, which is "predicated on negligence and not intent," does not trigger the willful misconduct exception to immunity. *Vega v. Columbia Borough*, No. 08-cv-5932, 2009 WL 2143549, at *5 (E.D. Pa. July 15, 2009).

Even if the Estate could establish willful misconduct as to assault and battery and IIED, it can't make out the substantive elements of either claim. Under Pennsylvania law, "[t]he question of whether an officer is liable for assault and battery … turns on whether he or she used an excessive degree of force, as a matter of Fourth Amendment law." *Garey v. Borough of Quakertown*, No. 12-cv-0799, 2013 WL 3305222, at *7 (E.D. Pa. July 1, 2013); *see also Renk*, 641 A.2d at 293. Because Officers Lowery and DeSantis used reasonable force against Mr. Paone, the assault and battery claim fails.

The IIED claim fails for the same reason. To make out a claim for IIED, the Estate must show that the Officers' conduct was "extreme and outrageous" and that they "intentionally or recklessly cause[d] severe emotional distress" to Lisa and Juliana Paone, who were present at the time of the shooting. *Taylor v. Albert Einstein Med. Ctr.*, 754 A.2d 650, 652 (Pa. 2000).[4] To be extreme and outrageous, the Officers' conduct must have been

---

[4] The Defendants argue that because the Pennsylvania Supreme Court has never "expressly recognized" a cause of action for IIED, the Estate's claim fails as a matter of law. *Taylor*, 754 A.2d at 652. Not so. Though that Court has not formally adopted the Restatement test, it recognizes that test as "setting forth the minimum elements necessary to sustain such a cause of action." *Id.* Thus, I consider the facts at hand with the Restatement test in mind.

"so outrageous in character, so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized society." *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. Ct. 2005) (quotation omitted). That's not what happened. Instead, the Officers acted within the bounds of the law, so their conduct was not extreme and outrageous. *See, e.g.*, *Taylor v. Officer Joseph Mazzone*, Civ. A. No. 15-6682, 2016 WL 4272266, at * 9 (E.D. Pa. Aug. 12, 2016).

Finally, the Estate asserts claims for survival and wrongful death under Pennsylvania law. *See* 42 Pa. C.S. §§ 8301, 8302. As the Parties acknowledge, these are not independent, substantive causes of action; "rather, they provide a vehicle through which plaintiffs can recover for unlawful conduct that results in death." *Sullivan v. Warminster Tp.*, 765 F. Supp. 2d 687, 707 (E.D. Pa. 2011). The assault and battery claim is the Estate's basis for its survival and wrongful death claims. Because the assault and battery claim fails, the survival and wrongful death claims may not proceed either.

## IV.   CONCLUSION

Mr. Paone's shooting was a tragedy for him and his family, and it's reflective of the challenges that anyone with mental health issues faces. But that doesn't mean that the Officers who shot him did something wrong. In an impossible position, faced with the threat of deadly force, they did what any police officer is allowed to do—they fired to protect themselves and others at the scene. They didn't violate Mr. Paone's constitutional

rights, and no reasonable juror could say otherwise. I will therefore grant Defendants' motion for summary judgment. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

December 13, 2024